# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

In Re:

**DUNCAN H. MOORE,**                                    **BK 07-70948-CMS-7**

    **Debtor.**

**FIRST NATIONAL BANK OF
CENTRAL ALABAMA**

     **Plaintiff,**                                    **AP 07-70044 CMS**

**vs.**

**DUNCAN H. MOORE,**

    **Defendant.**

## <u>MEMORANDUM OPINION</u>

This adversary proceeding came before the court on October 14, 2009, for trial on First National Bank of Central Alabama's ("FNB") Complaint to Deny Discharge and, in the alternative, to Determine Nondischargeability of Debt. (AP Doc. 1). David B. Anderson appeared on behalf of the FNB; Eric M. Wilson appeared on behalf of Duncan H. Moore ("Debtor"). After consideration of the evidence submitted at trial and the arguments of the parties this court **OVERRULES** FNB's objection to discharge pursuant to 11 U.S.C. § 727(a)(3) & (5). This court also **OVERRULES** FNB's objection to dischargeability pursuant to 11 U.S.C. § 523(a)(2)(A) and **SUSTAINS** FNB's objection to dischargeability pursuant to 11 U.S.C. § 523(a)(2)(B).

## JURISDICTION

The Bankruptcy Court has jurisdiction of Debtor's Chapter 7 case pursuant to 28 U.S.C. § 1334(a). This court has jurisdiction of this issue, a core bankruptcy proceeding, pursuant to 28 U.S.C. § 157(b). Jurisdiction is referred to the bankruptcy courts by the General Order of Reference

of the United States District Courts for the Northern District of Alabama, Signed July 16, 1984, As Amended July 17, 1984.

## FINDINGS OF FACT

Debtor graduated from the Business School at the University of Mississippi with a degree in Business Administration. Subsequent to graduation, Debtor worked at Pritchett-Moore as an insurance agent. After working as an insurance agent for a few years, the Debtor decided that he wanted to go a different direction and started asking his business acquaintances about potential businesses that he could invest in. While duck-hunting with Hinton Howell ("Howell") in 2004, Howell suggested that Debtor get in touch with David Lee Drain ("Drain"), the owner of Drain Forest Products, Inc. ("Drain Forest Products"). Howell was involved in Hinton Lumber d/b/a Cottondale Wood Products, which manufactured wood pallets. Drain Forest Products, a wood products company, purchased raw materials from lumber mills and then cut pallet parts to fit the specifications given by Cottondale Wood Products. Debtor decided to take Howell's advice and met with Drain in his office. After meeting with Drain, Debtor performed due diligence and determined that Drain Forest Products presented a good business opportunity. As a result, Debtor decided to purchase a 34% interest (340 shares) of Drain Forest Products for $250,000.00. The Debtor also had an option to purchase an additional 16% interest of Drain Forest Products. (Plaintiff's Exhibit 3).[1]

In order to consummate the purchase of the Drain Forest Products stock, Debtor paid

---

[1]At the time the Debtor invested in the company, Drain Forest Products had 20 employees, earnings of $170,000.00, and sales of $3.5 million. (Plaintiff's Exhibit 3).

2

$100,000.00 from his personal funds[2] and was loaned $150,000.00 from the Bank of Tuscaloosa.[3] As part of Bank of Tuscaloosa's loan approval process, Debtor was required to submit a personal financial statement. The personal financial statement submitted to Bank of Tuscaloosa was dated August 23, 2004 and reflected the following assets of the Debtor:

- $69,000 in Other Marketable Securities[4]
- $125,000.00 in Real Estate
- $250,000.00 in Other Securities-Not Readily Market.[5]

(Plaintiff's Exhibit 2). Bank of Tuscaloosa approved the loan and issued a $150,000.00 check to Drain on August 20, 2004. (Plaintiff's Exhibit 4). As a result of the Debtor's investment, he became the Vice-President of Drain Forest Products. Debtor also became a signatory on the checking account Drain Forest Products maintained at FNB on September 14, 2004. (Plaintiff's Exhibit 6).

Drain Forest Products was profitable in 2004, and in February of 2005 Debtor decided to exercise his option to purchase an additional 16% interest (160 shares) in the company. In order to consummate this purchase, the Debtor applied for another loan with Bank of Tuscaloosa for $200,000.00. Bank of Tuscaloosa approved the loan and issued a $200,000.00 check to Debtor on February 10, 2005. (Defendant's Exhibit 36 & 38). Around this same time, Drain and Debtor also

---

[2] Debtor's 2004 tax return indicates that the Debtor sold various stocks in order to provide the $100,000.00 in personal funds. (Defendant's Exhibit 78).

[3] Debtor's father is on the Board of Directors of Bank of Tuscaloosa.

[4] The $69,000.00 in securities consisted of stocks in Security Bank, Southern Company, GE, Covenant Bank, and an IRA.

[5] The $250,000.00 in Other Securities-Not Readily Market. appears to be the interest being purchased in Drain Forest Products.

Case 07-70044-CMS    Doc 53    Filed 05/06/10    Entered 05/06/10 12:52:59    Desc Main
Document    Page 3 of 29

decided to expand Drain Forest Products. Drain Forest Products purchased additional property and started a new pallet construction business without seeking financing; resources of the company were used instead. (Plaintiff's Exhibit 22). Because of this and a few other factors, such as the gap between receipt of accounts receivable and payments of accounts payable,[6] Drain Forest Products began having problems meeting operating expenses. (Plaintiff's Exhibit 22). Drain Forest Products regularly overdrew its checking account at FNB at this time. Although FNB had tolerated the frequent overdrawing on the account in the past, in late 2004 or early 2005 FNB requested that the overdraft be paid. To finance the payment of this overdraft, Drain and Debtor decided to borrow $152,000.00 from FNB on a 90 day basis. The primary source of repayment was to be permanent financing from either FNB or another bank. The second source of repayment was to be the personal guaranties of Debtor and Drain, as well as the liquidation of collateral.[7] Because the personal guaranty of the Debtor was to be a source of repayment for the short-term loan, the Debtor was required to submit a personal financial statement to FNB as part of its loan approval process. The Debtor filled out two such personal financial statements, the first dated January 10, 2005, the second dated January 19, 2005.[8] (Plaintiff's Exhibit 8 & 9). The primary dispute in this adversary proceeding centers around these two personal financial statements, principally the inaccuracies

---

[6]Drain Forest Products paid suppliers net 10 with no discount while customers were being billed net 30.

[7]The collateral listed on the Loan Committee Offering is a second lien on 5 acres of land and the personal guaranties of the Debtor and Drain.

[8]The court notes that when FNB filed its Motion for Summary Judgment, which sought a declaration that the Debtor's debt to FNB was nondischargeable and/or the Debtor should be denied a discharge, it attached a copy of the January 10, 2005 personal financial statement, but did not attach a copy of the January 19, 2005 personal financial statement. The court finds this disturbing.

contained in the statements and whether FNB knew about the inaccuracies before it approved the loan to Drain Forest Products.

The personal financial statement dated January 10, 2005 is written in the Debtor's handwriting and lists the following assets:

- $5,000.00 in Cash on Hand and in Banks
    - -$4,000.00 on deposit in Bank of Tuscaloosa
    - -$1,000.00 on deposit at FNB
- $50,000.00 in U.S. Government Securities
- $15,000.00 in Other Assets Readily Convertible to Cash
- $1,000,000.00 in Real Estate Owned[9]
    - -Home located at #7 Forest Lake[10]
- $150,000.00 in either Other Securities-Not Readily Marketable or Personal Property

The January 10, 2005 personal financial statement lists the following liabilities:

- $145,000.00 in Notes Due to Banks
- $72,000.00 in Real Estate Mortgages Payable

---

[9]The court finds it interesting that the personal financial statements submitted by Drain reflects that Drain owns $1,400,000.00 in real estate. One personal financial statement filled out by Drain was dated January 10, 2005, and it reflects that Drain owned $400,000.00 in Real Estate, comprised of his interest in real estate located at Sunset Bay. The second page of the financial statement indicates that the real estate was acquired in 2001 for $275,000.00 and that the real estate had a present value of $1,000,000.00 at the time financial statement was filled out. (Plaintiff's Exhibit 19) The second financial statement filled out by Drain was also dated January 10, 2005, and it indicates that Drain owned real estate worth $1,400,000.00. (Plaintiff's Exhibit 20). In addition to the residence located at Sunset Bay, real estate located in Gordo worth $300,000.00 (owned by Drain Forest Products), and 10 acres located in Auburn worth $100,000.00, were also shown on the second financial statement. The second financial statement shows $266,100.00 in total liens against the real estate. The third personal financial statement of Drain's was dated January 19, 2005 and is written in different handwriting than the first two personal financial statements. This handwriting appears to be the same as the handwriting on the Debtor's January 19, 2005 personal financial statement, i.e., the handwriting appears to be Tony Junkin's handwriting. (Plaintiff's Exhibit 21). This third personal financial statement shows that Drain owns $1,400,000.00 in real estate that is subject to liens of $263,000.00.

[10] The Debtor's Statement of Financial Affairs discloses that this property was later sold for $120,000.00. "All realized profit after liens and encumbrances were satisfied was used to purchase the homestead property scheduled in Debtors [sic] petition." (Defendant's Exhibit 2).

5

- $4,000.00 in Credit Card Debt

The Debtor testified that Tony Junkin ("Junkin"),[11] a loan officer at FNB, brought him the financial statement, that he filled out the financial statement in Junkin's presence, and that he discussed how he should fill it out with Junkin. The Debtor further testified that it was Junkin's idea to list the $1,000,000.00 in real estate that was in actuality owned by Debtor's parents. Debtor testified that he did not know who actually owned the property at the time he listed it on the personal financial statement, but that he listed it because he and his brother owned and operated a hunting camp, called Hood Bottom, LLC ("Hood Bottom") on this family land,[12] and Junkin told him that they had "to make this work."[13]

The second personal financial statement dated January 19, 2005, is not written in the Debtor's handwriting and lists the following assets:

- $5,000.00 in Cash on Hand and in Banks
     -$4,000.00 on deposit in Bank of Tuscaloosa
     -$1,000.00 on deposit at FNB
- $56,000.00 in Other Marketable Securities

---

[11]Junkin is Drain's uncle, and Junkin's son was an employee at Drain Forest Products. In addition, in early 2004, Junkin expressed an interest in purchasing Drain Forest Products, but Ken Bailey, the President of FNB, rejected the financing of the purchase due to a lack of financial history.

[12]The Debtor's Statement of Financial Affairs shows that Hood Bottom was in business to operate and maintain farming/hunting property. (Defendant's Exhibit 2). The Debtor testified that he owned half of Hood Bottom and that he and his brother ran various hunting retreats on the farming/hunting property. The farming/hunting property on which these hunting retreats were held consists of 1,200 acres of farmland located in Pickens County. On the Debtor's personal financial statement, the Debtor asserts a ½ interest in the farmland and values his ½ interest at $1,000,000.00. However, the Debtor now admits that he never owned in interest in the farmland; he only owned an interest in Hood Bottom.

[13]Junkin had been dove hunting at Hood Bottom prior to the filling out of this personal financial statement.

6

         -$25,000.00 in Security Bank Stock

         -$12,000.00 in a Roth IRA

         -$10,000.00 in a Kemper Fund

- $1,150,000.00 in Real Estate Owned

         -Home located at #7 Forest Lake

         -600 acres of farmland located in Pickens County

- $22,500.00 in Personal Property

The January 19, 2005 personal financial statement lists the following liabilities:

- $150,000.00 in Notes Due to Banks
- $72,000.00 in Real Estate Mortgages Payable
- $4,000.00 in Credit Card Debt
- $5,000.00 in Other Debts (loan on a truck)

The Debtor testified that Junkin filled out the January 19, 2005 personal financial statement using the first financial statement. In FNB's response to the Debtor's Request for Admissions, FNB admitted that "after [Debtor] had placed assets and liabilities in the wrong boxes and had made mathematical errors, Junkin instructed [Debtor] on how to complete the financial statement. In fact, Junkin assisted [Debtor] in placing the assets and liabilities, as represented by [Debtor], in the proper categories." (Defendant's Exhibit 6). A more correct answer would be that Junkin filled out the January 19, 2005 personal financial statement using information on the January 10, 2005 personal financial statement plus additional information that was provided by the Debtor.[14]

    In comparing the two personal financial statements with each other and with the personal

---

[14]The court comes to this conclusion because a review of the January 19, 2005 financial statement evidences that Junkin could not have completed it without the Debtor. For example, the January 10, 2005 personal financial statement does not list the 600 acres in Pickens County that the January 19, 2005 personal financial statement lists. How would Junkin know the acreage of the Pickens County farmland without the input of the Debtor? In addition, the January 19, 2005 personal financial statement lists $56,000.00 in Other Marketable Securities and specifically lists stock in Security Bank, in a Roth IRA, and in a Kemper Fund while the January 10, 2005 personal financial statements lists $50,000.00 in U.S. Government Securities and does not list any specific stocks. Junkin could not have corrected the January 10, 2005 personal financial statement without the help of the Debtor.

7

financial statement submitted to Bank of Tuscaloosa on August 23, 2004, a mere four months before the personal financial statements at issue were submitted to FNB, several discrepancies become apparent. The court will first address the discrepancies found when comparing the January 10, 2005 personal financial statement and the January 19, 2005 personal financial statement. The first discrepancy is that the January 10, 2005 personal financial statement shows $50,000.00 in U.S. Government Securities while the January 19, 2005 personal financial statement shows $56,000.00 in Other Marketable Securities. It is apparent to this court that Debtor just filled out the wrong line on the January 10, 2005 personal financial statement, and that Debtor never owned any interest in U.S. Government Securities as shown on the January 19, 2005 personal financial statement, but that he always meant to indicate that he owned stock in Security Bank, in a Roth IRA, and in a Kemper Fund.[15] The second discrepancy is that the January 10, 2005 personal financial statement shows $150,000.00 in Personal Property, while the January 19, 2005 personal financial statement shows $22,500.00 in Personal Property. The court believes that this is another case of the Debtor filling in the wrong box. The court came to this conclusion based on the fact that the $150,000.00 shown in Personal Property on the January 10, 2005 personal financial statement is moved up to the section titled Real Estate on the January 19, 2005 personal financial statement. That leaves one final discrepancy between the two personal financial statements - the addition of $22,500.00 in Personal Property to the January 19, 2005 personal financial statement. It turns out that the value of the

_____

[15]Debtor admitted in his testimony that the stock he owned in Security Bank had actually been sold at the time he filled out both financial statements. He further stated that he did not know that the stock had been sold: Debtor transferred his brokerage account to his cousin's husband; the Debtor thought the stock in Security Bank was just going to be transferred, but instead the Security Bank stock was liquidated and other stock was purchased. This court does not believe that this is material because at all times the Debtor has owned roughly $50,000.00 in securities.

8

Debtor's truck is $22,500.00. Again, this is not a real discrepancy because the truck is listed on the January 10, 2005 personal financial statement, just not on the first page. The truck is shown on the second page where the Debtor is responsible for itemizing his assets and liabilities. Therefore, this court concludes that there is no unexplained discrepancy between the January 10, 2005 personal financial statement and the January 19, 2005 personal financial statement. The court will next address the discrepancies between the January 19, 2005 personal financial statement submitted to FNB and the August 23, 2004 personal financial statement submitted to Bank of Tuscaloosa. First, there is a discrepancy in the value of Other Marketable Securities on the August 23, 2004 personal financial statement ($69,000.00) and the value of the Other Marketable Securities on the January 19, 2005 personal financial statement ($56,000.00). This discrepancy can be explained by the sale of some of the Debtor's stock. The second discrepancy is by far the largest. The August 23, 2004 personal financial statement lists $125,000.00 in Real Estate while the January 19, 2005 personal financial statement lists $1,150,000.00 in real estate. The $125,000.00 in Real Estate listed on the August 23, 2004 personal financial statement is actually the Debtor's residence. The Debtor's residence is also listed on the January 19, 2005 personal financial statement, but it is given a value of $150,000.00. This obviously does not account for the real estate worth $1,000,000.00 listed on the January 19, 2005 personal financial statement, but not on the August 23, 2004 personal financial statement. The $1,000,000.00 in Real Estate listed on the January 19, 2005 personal financial statement consists of 600 acres of farmland in Pickens County.[16] In fact, the Debtor has never had an interest in the farmland; the farmland has always been owned by the Debtor's parents. The

---

[16]The Debtor's family owns a total of 1200 acres of farmland in Pickens County. Debtor alleged that he held a ½ interest in the farmland; therefore, only 600 acres is shown on the January 19, 2005 personal financial statement.

9

Debtor testified that at the time the January 19, 2005 personal financial statement was filled out, he was not sure whether his parents owned the land or whether the land was held in a trust for him and his brother. The Debtor further testified that the January 19, 2005 personal financial statement was inaccurate, but that he did not know that it was inaccurate and that he was just doing what Junkin told him to do. Therefore, the Debtor should not have listed the $1,000,000.00 property on his personal financial statement, and he certainly should not have signed such statement wherein the $1,000,000.00 property was listed.[17] The last discrepancy between the August 23, 2004 personal financial statement is the fact that such personal financial statement does not list any personal property while the January 19, 2005 personal financial statement lists $22,500.00 in personal property. The January 19, 2005 personal financial statement indicates that the $22,500.00 in personal property is the Debtor's truck. Without any evidence to the contrary, this court can only conclude that the Debtor did not own the truck at the time he filled out the August 23, 2004 personal financial statement.

After helping the Debtor fill out the January 19, 2005 personal financial statement, Junkin put together a packet, called a Loan Committee Offering, to give to the loan committee at FNB so that the loan committee could approve or reject the loan requested by Drain Forest Products.[18] (Plaintiff's Exhibit 22). The Loan Committee Offering lists the latest financial statement as the

---

[17]Right above the Debtor's signature on the January 19, 2005 personal financial statement the following statement is found: "I/We furnish the foregoing as a true and accurate statement of my/our financial condition." Debtor testified that he did not read this statement before he signed it.

[18]Junkin was a member of the loan committee, but he did not participate in the vote on the loan for Drain Forest Products because he was the loan officer.

10

January 19, 2005 personal financial statement, but it is a summary of the January 10, 2005 personal financial statement that is attached. After the presentation of the Loan Committee Offering by Junkin, the loan committee officers[19] voted to accept the loan proposal. No attempt was made to verify the assets or liabilities shown on the January 10, 2005 personal financial statement or the January 19, 2005 personal financial statement. On February 9, 2005, Drain, as president of Drain Forest Products, and Debtor, as Vice President of Drain Forest Products, executed a note on behalf of Drain Forest Products in the amount of $152,021.00. (Defendant's Exhibit 20). No copy of the personal guaranty of the Debtor was admitted into evidence.

Drain Forest Products had trouble paying the February 2005 short-term loan and Drain Forest Products sought an extension; the extension was granted and the maturity date was extended to July 9, 2005. FNB made a demand for payment on this extension on July 12, 2005 via a letter from Roger Sanders requesting that the loan be paid in full by July 29, 2005. (Plaintiff's Exhibit 11). The Debtor and Drain, on behalf of Drain Forest Products, sought a second extension from FNB. Before the extension was approved, the Debtor informed FNB that Drain was admitted into rehab for a substance abuse problem.[20] (Plaintiff's Exhibit 10). Despite this fact, Ken Bailey, the President of FNB, Alan Wood, and Samuel Parks approved the extension and the loan was renewed on September 26, 2005. (Plaintiff's Exhibit 24). The primary source of repayment was again to be a

---

[19]The loan committee officers were Ken Baily, Alan Wood, Derrell O'Briant, Dale Moore, Susie Potts, and Donna Nanace. (Plaintiff's Exhibit 22). Alan Wood is a golfing buddy and friend of the Debtor's father. The personal relationship between Alan Wood and the Debtor is reflected in an exchange of emails in May of 2006. (Plaintiff's Exhibit 16).

[20]Samuel Parks, the current President of FNB, testified that FNB knew that Drain had been admitted to rehab by August 3, 2005.

11

refinance of Drain Forest Products' debt with another financial institution.[21]  The secondary source

of repayment was again to be the sale of collateral.  The Debtor and Drain are listed as guarantors

of this renewal note.  (Plaintiff's Exhibit 24).  On September 26, 2005, Drain, as president of Drain

Forest Products, and Debtor, as Vice President of Drain Forest Products, executed the renewal note

on behalf of Drain Forest Products in the amount of $152,146.00.  (Defendant's Exhibit 23).  No

copy of the personal guaranty of the Debtor was admitted into evidence.

When Drain was admitted into rehab for a substance abuse problem, the real problems began

for Drain Forest Products because Drain had handled the finances of the company while the Debtor

handled production.  The Debtor was unable to refinance the debt of Drain Forest Products and FNB

made another demand for payment on January 21, 2006.  (Plaintiff's Exhibit 12).  The letter warned

the Debtor and Drain that they if the loan was not repaid by February 3, 2006, "the bank would have

no alternative but to turn the matter over to the bank's counsel for collection of the loan" and that

such collection efforts would include "foreclosure of the real property securing this loan and pursuit

of the guarantors individually."  (Plaintiff's Exhibit 12).  Neither the Debtor nor Drain were able to

repay the loan, and FNB filed suit against the Debtor and Drain in the Circuit Court of Pickens

---

[21] On page 4 of the Credit Approval Document approving the extension of the February 2005 short-term loan, the following information is found: "Drain Forest Products is currently in the process of refinancing its debt, including this loan, with its primary bank (Regions).  The loan is expected to close by December 1.  The company has a contract to sell the pallet operation and 5 acres of land (leaving 5 acres as collateral on this facility).  FNBCA will receive a $35M reduction on this facility when the sale occurs."  (Plaintiff's Exhibit 24).  Page 4 of the Credit Approval Document also contained the following assessment of risk: "A risk involved in this facility is that the [primary source of repayment] is refinance.  However, if the refinance does not occur by December 1, the bank will either secure with personal assets and term out the balance on an acceptable term or require it to be paid off and pursue legal means."  (Plaintiff's Exhibit 24).  The sale did in fact occur, although the refinancing did not and the bank did pursue legal action against the Debtor.

County. Drain filed a voluntary Chapter 7 bankruptcy petition on December 13, 2006. Drain listed FNB as an unsecured creditor and scheduled the debt owed to FNB at $125,000.00. The bankruptcy petition did not disclose an ownership interest in any real estate.[22] On March 16, 2007, a judgment was entered against the Debtor in favor of FNB for $153,088.39. (Plaintiff's Exhibit 15). On June 6, 2007, Debtor filed a voluntary Chapter 7 bankruptcy petition.

After the Debtor filed his bankruptcy petition, FNB filed this adversary proceeding seeking a determination that Debtor should be denied his Chapter 7 discharge and also seeking a determination that the debt owed to FNB was nondischargeable. FNB's main grievances against the Debtor include the discrepancies and misstatements included on the personal financial statements submitted to FNB. FNB argues that it relied upon these personal financial statements in making its decision to loan money to Drain Forest Products and also relied upon these personal financial statements when it granted the extensions of the maturity date of the loan. To illustrate this point, the FNB answered an interrogatory in the following manner:

> The false pretenses, false representation and fraud claims all arise out of the same factual background. FNB initially made loans to Drain Forest Products ("DFP"). Moore became an owner of DFP and made representations concerning the financial condition and viability of the DFP business (and that they were working on a new loan at Regions) in order to induce FNB to allow overdrafts and to extend those overdrafts pursuant to a promissory note. The representations were made verbally and in the form of two personal financial statements submitted by Moore and a June 30, 2004 DFP financial statement submitted by Drain and Moore to FNB.
>
> These representations were made from time to time commencing in 2004 and continuing until July of 2005. The representations included the two financial statements of Moore in which he represented to FNB that he owned an interest in 600 acres of land in Pickens County, Alabama, worth $1,000,000. He also listed $70,000 of marketable

---

[22]Drain's Statement of Financial affairs discloses that his residence was sold in September 2006, that the mortgage on the residence was satisfied, and that the proceeds from the sale were paid to his ex-wife pursuant to a divorce decree. In personal financial statements submitted to FNB, Drain had valued his residence at $1,000,000.00.

Case 07-70044-CMS    Doc 53    Filed 05/06/10    Entered 05/06/10 12:52:59    Desc Main
Document    Page 13 of 29

securities, but has not been able to produce any records establishing that he owned these securities or their value. FNB relied upon these statements and allowed the overdrafts and granted the various extensions. Had FNB known the true facts, it could have demanded payment of the overdraft and received payment from DFP.

(Defendant's Exhibit 6). The Debtor asserts that FNB did not rely upon such personal financial statements and that FNB extended credit to Drain Forest Products because Debtor is the son of a prominent businessman in Tuscaloosa. Debtor's father testified that he spoke with Alan Wood, an employee of FNB, and was advised by Wood that FNB was suing Debtor in order to get to him.[23] FNB denied this assertion in its Answer to question 5 of the Debtor's Request for Admissions, stating: "FNB denies that it extended credit to [Debtor] 'simply' because [Debtor] is the son of [Debtor's father]. FNB admits that it was aware of this fact and FNB admits that this fact caused [Debtor] to pass the 'character' test of credit. In addition, this fact caused FNB to loan money under the mistaken belief that [Debtor] actually owned a $1,000,000 interest in family real estate holdings." (Defendant's Exhibit 6). In its Response to question 6, FNB further stated that "[FNB] did not solely rely on the personal financial statement of [Debtor] in extending any of the loans in question." (Defendant's Exhibit 6). In addition to FNB's discovery responses, Samuel Parks testified on behalf of FNB. Samuel Parks came to FNB March 15, 2005 as a senior loan officer. Although, Samuel Parks was not at FNB when the initial loan was made to Drain Forest Products, he was involved in the numerous decisions to extend the loan. He testified that FNB considered both the Debtor's personal financial statement and Drain's personal financial statement in making the decision about whether or not to renew Drain Forest Products' loan. He further testified that FNB also relied upon

_____

[23]Because Debtor's father was on the Board of Directors at Bank of Tuscaloosa, he felt a moral obligation to pay his son's debt to that institution. He did not feel any such obligation to repay the debt his son owed to FNB.

Case 07-70044-CMS    Doc 53    Filed 05/06/10    Entered 05/06/10 12:52:59    Desc Main
Document    Page 14 of 29

the fact that Regions Bank was considering restructuring the debt of Drain Forest Products and that FNB also relied upon the 2004 tax return of Drain Forest Products. He further testified that FNB did not question how a twenty-something man could afford a $1,000,000.00 piece of property because the Debtor was the son of a successful businessman and landowner.

### CONCLUSIONS OF LAW

The issues before this court are whether the Debtor should be denied a discharge pursuant to § 727(a)(3) and/or § 727(a)(5) of the Bankruptcy Code[24] and whether the debt owed to FNB is nondischargeable pursuant to § 523(a)(2)(A) and/or § 523(a)(2)(B). The causes of action relating to § 727 shall be addressed first because if the Debtor is denied a discharge, all the debts that Debtor owes will be nondischargeable, and there will be no need to determine whether the debt owed to FNB is nondischargeable pursuant to § 523(a)(2)(A) and/or § 523(a)(2)(B).

### I. Section 727(a)(3)

"[Section] 727 of the Bankruptcy Code allows debtors to receive a general discharge of their obligations in keeping with the primary purpose of bankruptcy law, to give honest debtors a fresh start 'unhampered by the pressure and discouragement of preexisting debt.'" Farouki v. Emirates Bank Int'l, Ltd., 14 F.3d 244, 249 (4th Cir. 1994) (quoting Lines v. Frederick, 400 U.S. 18, 19, 91 S. Ct. 113, 114, 27 L. Ed. 2d, 124 (1970)). A leading treatise on bankruptcy law has stated:

> The provisions denying a discharge to a debtor are generally construed liberally in favor of the debtor and strictly against the creditor. Courts have noted that "a total bar to discharge is an extreme penalty." The reasons for denial of a discharge must be real and substantial rather than technical and conjectural. However, "[w]hile the law favors discharges in bankruptcy, it will not ordinarily tolerate the [debtor's] intentional departure from honest business practices where there is a reasonable likelihood of prejudice.

---

[24]All section references are to the Bankruptcy Code unless stated otherwise.

6 COLLIER ON BANKRUPTCY ¶ 727.01[4] (15th ed. rev. 2008). See also Micro Connections, Inc. v. Shah (In re Shah), 388 B.R. 23, 32 (Bankr. E.D.N.Y. 2008) (stating that because a discharge is vital to the fresh start contemplated by bankruptcy, § 727, which provides grounds for the denial of a debtor's discharge, "must be strictly construed against the party objecting to the debtor's discharge and liberally in favor of the debtor" ).

In a trial on a complaint objecting to a discharge, the plaintiff bears the burden of proving that a discharge is unwarranted. FED. R. BANKR. P. 4005. To carry its burden, the plaintiff must prove such discharge is unwarranted by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 287, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991). If the plaintiff establishes a prima facie case, the burden shifts to the debtor to make a credible explanation of his actions. Buckeye Retirement Co., L.L.C. v. Howells (In re Howells), 365 B.R. 764, 769 (Bankr. N.D. Ohio 2007).

Section 727(a)(3) provides that:

(a) The court shall grant the debtor a discharge, unless-
    (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

11 U.S.C. § 727(a)(3). Therefore, in order to establish a prima facie case under § 727(a)(3), FNB must establish by a preponderance of the evidence that: (1) Debtor either failed to keep or preserve any recorded information, or committed an act of destruction, mutilation, falsification, or concealment of any recorded information; and (2) that as a result of such failure or act, it is impossible to ascertain the financial condition and material business transactions of the Debtor. 11 U.S.C. § 727(a)(3); Howells, 365 B.R. at 768; Lewis v. Summers (In re Summers), 320 B.R. 630,

16

638 (Bankr. E.D. Mich. 2005).

FNB did not submit any evidence that would support a finding by this court that the Debtor failed to keep or preserve recorded information necessary to ascertain the financial condition of the Debtor. In addition, FNB was given the opportunity to submit a written closing argument in place of the typical spoken closing argument at the end of trial. Nowhere in such post-trial brief does FNB address the § 727(a)(3) cause of action. Therefore, this court finds that FNB has not met its burden of proof and that its objection to discharge pursuant to § 727(a)(3) is due to be overruled.

## II. Section 727(a)(5)

Section 727(a)(5) provides that:

(a) The court shall grant the debtor a discharge, unless-
> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

11 U.S.C. § 727(a)(5). Therefore, to establish a prima facie case under § 727(a)(5), FNB must establish by a preponderance of the evidence that the Debtor: (1) experienced a loss or deficiency of assets; and (2) cannot provide a satisfactory explanation for such loss. 11 U.S.C. § 727(a)(5).

FNB did not submit any evidence that would support a finding by this court that the Debtor failed to explain a loss of assets. In addition, FNB was given the opportunity to submit a written closing argument in place of the typical spoken closing argument at the end of trial. Nowhere in such post-trial brief does FNB address the § 727(a)(5) cause of action. Therefore, this court finds that FNB has not met its burden of proof and that its objection to discharge pursuant to § 727(a)(5) is due to be overruled.

17

<u>III. Section 523(a)(2)(A)</u>

Because the court overruled the objections to discharge brought pursuant to § 727, the court must now determine whether the specific debt owed to FNB is a nondischargeable debt pursuant to § 523. If a debtor is granted a general discharge pursuant to § 727, all of a debtor's debts are discharged except for debts of the type listed in § 523(a). FNB asserts that the debt owed to it is excepted from discharge pursuant to § 523(a)(2)(A) and/or § 523(a)(2)(B). Section 523(a)(2) provides that:

> (a) A discharge under 727 . . . . of this title does not discharge an individual debtor from any debt-
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>>> (B) use of a statement in writing-
>>>> (i) that is materially false;
>>>> (ii) respecting the debtor's or an insider's financial condition;
>>>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>>>> (iv) that the debtor caused to be made or published with the intent to deceive;

11 U.S.C. § 523(a)(2). Section 523(a)(2) has two subsections, (A) and (B). Subsection 523(a)(2)(A) provides that debts will not be discharged to the extent that the debtor obtained them by false pretenses, a false representation or actual fraud. Subsection 523(a)(2)(B) provides that debts will not be discharged if they were obtained by the use of false financial documents or statements.

"Paragraphs (A) and (B) of § 523(a)(2) are mutually exclusive-the fact that Congress excluded debts obtained through use of false financial statements from paragraph (A), and dealt with those debts in a separate subparagraph (B), makes clear that a plaintiff must prove different evidence for each subsection." <u>Gieseking v. Thomas</u>, 358 B.R. 754, 766 (Bankr. S.D. Ill. 2007). <u>See</u> also <u>Fairfax State</u>

18

<u>Savs. Bank v. McCleary (In re McCleary)</u>, 284 B.R. 876, 883 (Bankr. N.D. Iowa 2002). The proof offered by FNB at trial that went to the circumstances under which it agreed to loan the Debtor money were all written statements prepared by the Debtor, or testimony relating to such written statements. Therefore, FNB failed to offer evidence that would support a finding of a nondischargeable debt pursuant to § 523(a)(2)(A). <u>In re McCleary</u>, 284 B.R. at 884. In addition, FNB was given the opportunity to submit a written closing argument in place of the typical spoken closing argument at the end of trial. Nowhere in such post-trial brief does FNB address the § 523(a)(2)(A) cause of action. Therefore, this court finds that FNB has not met its burden of proof and that its objection to discharge pursuant to § 523(a)(2)(A) is due to be overruled.

IV. Section 523(a)(2)(B)

Section 523(a)(2)(B) provides:

> (a) A discharge under 727 . . . . of this title does not discharge an individual debtor from any debt-
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by-
>>> (B) use of a statement in writing-
>>>> (i) that is materially false;
>>>> (ii) respecting the debtor's or an insider's financial condition;
>>>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>>>> (iv) that the debtor caused to be made or published with the intent to deceive;

11 U.S.C. § 523(a)(2)(B). To establish a prima facie case under § 523(a)(2)(B), FNB must establish by a preponderance of the evidence that: (1) the debt was obtained by use of a statement in writing; (2) such writing was materially false; (3) such writing was with respect to Debtor's financial condition; (4) FNB reasonably relied on such writing; and (5) Debtor caused such writing to be made or published with the intent to deceive. <u>Equitable Bank v. Miller (In re Miller)</u>, 39 F. 3d 301, 304

19

(11th Cir. 1994). If FNB fails to meet its burden on any of these elements, the debt is dischargeable. Id.

FNB met its burden as to the first element required by § 523(a)(2)(B), that the debt owed to it was obtained by use of a statement in writing. FNB obtained a judgment against the Debtor personally when it sued the Debtor to enforce the notes the Debtor signed to memorialize the loan taken out on behalf of Drain Forest Products. FNB established that this loan was obtained, at least in part, as a result of a personal financial statement signed by the Debtor and submitted to FNB's loan committee. Therefore, the loan was obtained by the use of a statement in writing.

FNB met its burden as to the second element required by § 523(a)(2)(B), that the statement in writing be materially false. "A financial statement is materially false if it 'portrays a substantially untruthful picture of a financial condition by misrepresenting information of the type which normally would affect the decision to grant credit.'" Colorado East Bank & Trust v. McCarthy (In re McCarthy), 421 B.R. 550, 559 (Bankr. D. Col. 2009) (quoting Blue Ridge Bank & Trust v. Cascio (In re Cascio), 318 B.R. 567, 573 (Bankr. D. Kan. 2004)). The personal financial statement signed by the Debtor overestimated his net worth by $1,000,000.00 by including 600 acres of real estate that the Debtor admits he never had an ownership interest in. The Loan Committee Offering put together by Junkin summarized the January 10, 2005 personal financial statement filled out by the Debtor and showed that the Debtor's net worth was $999,000.00. Without the addition of the $1,000,000.00 property, the Debtor's net worth would have been negative. A negative worth of a personal guarantor would certainly affect a lending institution's decision to grant credit. As such, the overestimation of the Debtor's net worth makes the personal financial statement signed by the Debtor materially false. Therefore, the loan was obtained by the use of a statement in writing that

20

was materially false.

FNB met its burden as to the third element required by § 523(a)(2)(B), that the writing was with respect to the debtor's financial condition. The personal financial statement signed by the Debtor purported to list all of the Debtor's assets and liabilities. Nothing concerns a debtor's financial condition more than his assets and liabilities. Therefore, the loan was obtained by the use of a statement in writing that was materially false and such statement in writing dealt with the debtor's financial condition.

FNB met its burden as to the fourth element required by § 523(a)(2)(B), that the creditor reasonably relied on the statement in writing. "The reliance component of § 523(a)(2)(B) is a two-step analysis: (1) the creditor must first show that it actually relied on the financial statement and (2) that reliance must be reasonable." In re McCarthy, 421 B.R. at 560. "To establish actual reliance, the creditor must show its reliance on the false financial statement was 'a contributory cause of the extension of credit and that credit would not have been granted if the lender had received accurate information.'" Id. at 560-61. (quoting Rural Enters. of Oklahoma, Inc. v. Watson (In re Watson), No. WO-02-090, at *3 (10th Cir. BAP May 29, 2003)). "Although actual reliance must be demonstrated, a creditor does not have to show that it relied exclusively on the false financial statement. It is sufficient if the creditor establishes that it partially relied on the false statement. Id. at 561. FNB showed that it actually relied on the Debtor's personal financial statement. The personal financial statement was summarized in the Loan Committee Offering that the loan committee relied upon when it first approved the loan to Drain Forest Products. All of the testimony and the documents indicate that the loan committee relied exclusively upon the Loan Committee Offering in deciding to grant the loan to Drain Forest Products, also the Loan Committee Offering indicates that the

Case 07-70044-CMS    Doc 53    Filed 05/06/10    Entered 05/06/10 12:52:59    Desc Main
Document      Page 21 of 29

personal guaranties of Drain and the Debtor were the primary collateral for the loan. Samuel Parks, a senior loan officer at FNB who was employed after the original loan was made to Drain Forest Products, testified that the net worth of the Debtor was one of the deciding factors in deciding to approve both the original loan and the subsequent extensions of the loan. Samuel Parks further testified that FNB did not rely primarily on Drain because most of Drain's income came from Drain Forest Products and Drain did not have any unencumbered property while the Debtor's personal financial statement indicated that the Debtor had $1,000,000.00 in unencumbered property. The court finds the information contained in the Loan Committee Offering coupled with the testimony of Samuel Parks shows that FNB actually relied upon the personal financial statement of the Debtor when it made the original loan to Drain Forest Products and when it granted the extensions of the loans. See, Rural Enters. of Oklahoma v. Watson (In re Watson), No. WO-02-090, 2003 WL 21241702, at *3 (10th Cir. BAP May 29, 2003)) (finding that the testimony of the loan officers from the lending bank that the bank would not have made a loan to debtors if the bank had been aware of other guaranties signed by the debtors coupled with the fact that the credit memo generated by the loan officers indicated that the loan was to be secured by collateral and the personal guaranties of the debtors was ample evidence of actual reliance on the part of the bank).

In addition to proving actual reliance, FNB must also prove that such reliance was reasonable. "Reasonableness depends on the particular facts and circumstances of the case." In re McCarthy, 421 B.R. at 562. In this case, the court first became concerned about the reasonableness of FNB's reliance on the personal financial statement of the Debtor when it failed to find any personal guaranty of the Debtor in the numerous documents submitted at trial. If the Debtor was not personally liable for the loan FNB made to Drain Forest Products, it would not be reasonable for

22

FNB to rely upon the Debtor's personal financial statement in making the loan to Drain Forest Products. However, a careful reading of Alabama law shows that a personal guaranty was not necessary for the Debtor to be personally liable on the note. Section 7-3-402 of the Uniform Commercial Code, entitled Signature by a Representative, enacted by Alabama provides, in pertinent part, that: "[I]f the form of the signature does not show unambiguously that the signature [by a representative] is made in a representative capacity . . . . the representative is liable on the instrument unless the representative proves that the original parties did not intend the representative to be liable on the instrument." ALA. CODE § 7-3-402(b)(2) (LexisNexis 2002). The Debtor signed the original loan documents, as well as the extension documents of the original loan, "Duncan H. Moore." This indicates that the Debtor was signing in his individual capacity. However, below the signature line the Debtor's name is shown as "Duncan H. Moore, Vice President." This indicates that the Debtor was signing in his representative capacity. This court finds that the signature of the Debtor on the loan documents is ambiguous. Therefore, pursuant to Alabama law, the intent of the parties governs whether the Debtor was personally liable to FNB when he signed the note on behalf of Drain Forest Products and before FNB obtained a judgment against the Debtor personally in the Circuit Court of Pickens County. Because the Debtor testified that he is liable to FNB and because the Debtor never denied that he is liable to FNB, this court finds that the intent of the parties at the time the loan documents were executed was that the Debtor would be personally liable on the loan made to Drain Forest Products. Therefore, the Debtor is personally liable on the note and FNB was reasonable in its reliance on the Debtor's personal financial statement.

Another issue that caused this court concern about the reasonableness of FNB's reliance on the personal financial statement of the Debtor was the Debtor's insistence that Junkin, the loan

Case 07-70044-CMS    Doc 53    Filed 05/06/10    Entered 05/06/10 12:52:59    Desc Main
Document        Page 23 of 29

officer compiling information for the loan committee, knew that the Debtor did not actually own the farmland in Pickens County. This allegation caused the court concern because it would not be reasonable for the loan committee at FNB to rely upon a personal financial statement if the loan committee knew, or had imputed knowledge, that the information on the personal financial statement was false. Deutsche Financial Services v. Osborne (In re Osborne), 257 B.R. 14, 23 (Bankr. C.D. Cal. 2000). However, even if Junkin knew or had reason to know that the Debtor did not own the $1,000,000.00, this knowledge would only be legally significant if it could be imputed to the loan committee because Junkin is not the one who made the decision to approve the loan. The court turns to Alabama law to determine whether any knowledge held by Junkin can be imputed to the loan committee.[25] Junkin testified that he is currently employed at FNB as a loan officer and that he was employed by FNB as a loan officer at the time the loan was made to Drain Forest Products. He further testified that, as a loan officer, his duties included gathering information from prospective borrowers and handing the information to the loan committee so that the loan committee could make an informed decision about whether to grant credit. Based upon this testimony, this court is comfortable finding that Junkin was acting as FNB's agent while he was gathering information from the Debtor and helping the Debtor fill out the second personal financial statement dated January 19,

[25] Although the court is impressed with FNB's counsel for finding "the spotted dog case" handed down by the Fifth Circuit Court of Appeals in 1937, this court believes that the case is distinguishable from this one. The court believes this to be true because the agent in the Fifth Circuit Court of Appeals case had "the same interest to conceal [the false information] as if he were borrowing the money for himself, and for that reason his knowledge is not imputable to the bank." First Nat. Bank of Waco, Tex. v. Dorbandt, 92 F. 2d 948 (5th Cir. 1937). The same cannot be said of Junkin in this case. Although Junkin is Drain's uncle, and the court is sure that he desired for his nephew to succeed, Junkin would not benefit financially if the loan to Drain Forest Products was approved. Junkin did not have an interest in Drain Forest Products nor did Junkin receive any compensation from FNB when the loan to Drain Forest Products was approved.

24

2005.  This court is also comfortable finding that Junkin was acting within the line and scope of his employment when he was gathering information from the Debtor and helping the Debtor fill out the January 19, 2005 personal financial statement.  "[I]n Alabama and elsewhere the general rule is that a principal is chargeable with and bound by the knowledge of his agent while acting within the scope of his authority."  <u>First Alabama Bank of Montgomery v. First State Insurance Co., Inc.</u>, 899 F. 2d 1045, 1060 n. 8 (11th Cir. 1990).[26]  "The . . . theory . . . apparently advanced in Alabama, is based on the conclusive presumption that the agent has discharged his duty to impart the principal with all his knowledge which is necessary for the principal's protection or guidance.  Whether the agent has discharged this duty is irrelevant to the legal presumption that the principal shares the agent's knowledge."  <u>Id.</u>  "[T]he reason courts impose constructive knowledge upon a principal is to avoid the injustice which would result if the principal could have an agent conduct business for him and at the same time shield himself from the consequences which would ensue from knowledge of conditions or notice of the rights and interests of others had the principal transacted his own business in person."  <u>Id.</u>  "It is universally accepted that '[t]he rule imputing an agent's knowledge to the principal is designed to protect only those who exercise good faith, and is not intended to serve as a shield for unfair dealing by the third person.'"  <u>Id.</u>  (quoting 3 Am. Jur. 2d <i>Agency</i> § 295 ).  However, "[t]he rule is an equitable one which cannot be employed by those with unclean hands" and "it is invoked only in cases in which a court imposes liability upon a principal for his agent's dealings with an innocent third party."  <u>Id.</u>  The Debtor is not an innocent third party in this case.

---

[26]In fact, the Alabama Code provides: "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of and ought in good faith and the exercise of ordinary care and diligence to communicate to the other.  Ala. Code § 8-2-8 (LexisNexis 2002).

25

The Debtor testified that he was not sure who owned the 600 acres of farmland in Pickens County and yet he still placed it on both the January 10, 2005 personal financial statement and the January 19, 2005 personal financial statement. Because the Debtor misrepresented a material fact and was a party to the deception perpetrated on FNB, he cannot now claim that he should not be held accountable for his actions because FNB knew or had reason to know that it was being lied to. Id. (finding that defendant could not invoke the rules of agency because: "[Defendant] clearly is not an innocent third party in this case. It misrepresented a material fact which caused detrimental reliance by [plaintiff] and cannot now invoke equitable principles of agency law to avoid liability for its fraudulent conduct."). Therefore, whatever knowledge Junkin might have had in regards to the truthfulness of Debtor's January 10, 2005 and January 19, 2005 personal financial statements cannot be imputed to the loan committee or FNB. As such, whatever knowledge Junkin may have had is not legally significant and does not affect this court's determination of whether FNB's reliance on the Debtor's personal financial statement was reasonable.

In addition to the potential problems identified by this court above, the Debtor also asserted that FNB's reliance on the Debtor's personal financial statement was unreasonable because FNB could have determined that the Debtor did not own the property by conducting a simple title search on the Pickens County farmland. This assertion is only true if FNB had an independent duty to verify the assets and liabilities listed on the personal financial statement signed by the Debtor. "A creditor's reliance may be reasonable *without* additional verifying steps where: (1) there are 'ongoing relationships between the debtor and creditor;' (2) if the debtor's financial statements 'contained no information indicating that further investigation was required;' (3) there is 'no indication that further investigation would have uncovered the falsity of the representations;' or (4) where 'the asserted

26

failure to verify occurred after the loan had been made.'" In re McCarthy, 421 B.R. at 562 (quoting In re Watson, 2003 WL 21241702, at *4) (emphasis in original). Therefore, "one of the situations where a creditor is deemed to reasonably rely on a financial statement without additional investigation is where nothing in the financial statement presents a 'red flag' to alert the creditor that further investigation is necessary. Id. (quoting Leadership Bank v. Watson (In re Watson), 958 F.2d 977 (10th Cir.1992)). The only potential red flag on the Debtor's personal financial statement is that in normal circumstances it would seem odd that a young man in his twenties would own a $1,000,000.00 piece of property. However, this case involves special circumstances. The Debtor is a son of a prominent businessman and landowner. Several people on the loan committee knew of the Debtor's father, and it would not be unreasonable for them to believe the Debtor's assertion that he owned a $1,000,000.00 piece of property based upon such knowledge. In addition, Samel Parks, one of the individuals who approved the later extensions of the loan, testified that he knew of the Debtor's father. He further testified that he was not suspicious of the Debtor's asserted ownership interest in a $1,000,000.00 piece of property because he knew who the Debtor's father was. Because there were no "red flags" on either of the Debtor's personal financial statements, it was reasonable for FNB to rely on such personal financial statements in approving both the original loan and the subsequent extensions. As such, this court finds that FNB met its burden of proof and proved that it reasonably relied upon the Debtor's false financial statement. Therefore, the loan was obtained by the use of a statement in writing that was materially false, such statement in writing dealt with the debtor's financial condition, and the creditor reasonably relied upon such statement.

FNB met its burden as to the fifth element required by § 523(a)(2)(B), that the debtor caused the statement in writing to be made or published with the intent to deceive. "An intent to deceive

does not mean that a debtor acted with a 'malignant heart.'" <u>In re McCarthy</u>, 421 B.R. at 563-64 (quoting <u>Heritage Bank of St. Joseph v. Bohr (In re Bohr)</u>, 271 B.R. 162, 169 (Bankr. W.D. Mo. 2001)). "Rather, 'a statement need only be made with reckless disregard for the truth to make the underlying debt nondischargeable under § 523(a)(2)(B).'" <u>Id.</u> at 564 (quoting <u>Cent. Nat'l Bank & Trust Co. v. Liming (In re Liming)</u>, 797 F. 2d 895, 897 (10th Cir. 1986)). In his testimony, the Debtor admitted that in January of 2005, when he filled out the first financial statement for FNB, he did not know whether the 1,200 acres of farmland in Pickens County, in which he claimed a ½ ownership interest, was held in his parents' name or held in a trust because the land had not been in the family for very long at that time. In short, the Debtor admitted that he had no idea who or what entity actually held title to the farmland. The court finds that when a debtor puts on a personal financial statement an asset to which he has no cause to believe he owns, such debtor shows a reckless disregard for the truth. Because that is exactly what the Debtor did in this case, the court further finds that the Debtor acted with reckless disregard for the truth when he listed on his personal financial statement that he had an ownership interest in 600 acres of farmland in Pickens County. Because the Debtor acted with a reckless disregard for the truth, he acted with the requisite intent to deceive called for pursuant to § 523(a)(2)(B). As such, this court finds that FNB met its burden of proof and proved that the Debtor caused a false financial statement to be made or published with the intent to deceive. Therefore, the loan was obtained by the use of a statement in writing that was materially false, such statement in writing dealt with the Debtor's financial condition, such statement was made by the Debtor with the intent to deceive, and FNB reasonably relied upon such statement.

FNB met its burden of proof as to all elements required by § 523(a)(2)(B). Therefore, this court finds that the judgment obtained by FNB against the Debtor personally that was based upon

Case 07-70044-CMS    Doc 53    Filed 05/06/10    Entered 05/06/10 12:52:59    Desc Main
Document      Page 28 of 29

the Debtor's personal liability on the original loan made to Drain Forest Products, and the subsequent extensions of that loan, is nondischargeable pursuant to § 523(a)(2)(B). Therefore, FNB's Objection to Dischargeablity is due to be sustained**.**

## CONCLUSION

The court finds that FNB failed to meet its burden of proof as to its Objection to Discharge pursuant to § 727(a)(3). Therefore, this court **OVERRULES** such objection. The court finds that FNB failed to meet its burden of proof as to its Objection to Discharge pursuant to § 727(a)(5). Therefore, this court **OVERRULES** such objection. The court finds that FNB failed to meet its burden of proof as to its Objection to Dischargeability pursuant to § 523(a)(2)(A). Therefore, this court **OVERRULES** such objection. The court finds that FNB met its burden of proof as to is Objection to Dischargeability pursuant to § 523(a)(2)(B). Therefore, this court **SUSTAINS** such objection

An Order, consistent with these findings pursuant to Fed. R. Bankr. P. 7052, will be entered separately.

**DONE and ORDERED** this May 6, 2010.

/s/ C. Michael Stilson
C. Michael Stilson
United States Bankruptcy Judge

Case 07-70044-CMS    Doc 53    Filed 05/06/10    Entered 05/06/10 12:52:59    Desc Main
Document    Page 29 of 29